UNITED STATES of America,
Plaintiff–Appellee,

v.

Billy H. LASTER, Defendant–Appellant.

No. 90–6389.

United States Court of Appeals,
Tenth Circuit.

March 5, 1992.

M. Jay Farber, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty. and Leslie M. Kaestner, Asst. U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Chris Eulberg of Eulberg & Brink, Oklahoma City, Okl., for defendant-appellant.

Before LOGAN and McWILLIAMS, Circuit Judges, and SPARR, District Judge.*

McWILLIAMS, Circuit Judge.

In a four-count indictment, Billy Harold Laster was charged in the first three counts with using the telephone on May 3, 9, and 23, 1990, respectively, to facilitate a cocaine purchase, in violation of 21 U.S.C. § 843(b). In a fourth count, Laster was charged with the possession on May 23, 1990, of eight ounces of cocaine, a Schedule II controlled substance, with an intent to distribute it, in violation of 21 U.S.C. § 841(a)(1).

Pursuant to a plea agreement, Laster on September 17, 1990, pleaded guilty to count four, i.e., possession of eight ounces of cocaine with an intent to distribute the cocaine, and the other three counts in the indictment involving telephone calls were dismissed. On November 19, 1990, Laster was sentenced under the Sentencing Guidelines to 97 months imprisonment to be followed by three years of supervised release and a $50 special assessment.

Pursuant to 18 U.S.C. § 3742(a)(2), Laster appeals the sentence thus imposed, contending that the district court erred in its understanding and application of the Sentencing Guidelines then in effect. Before referring to the applicable guidelines, some background facts should be developed.

From the presentence report we learn that in 1986 the FBI became aware that one Jose Alberta Munos, a Columbian who was then residing in Florida, was selling kilogram quantities of cocaine to various individuals who were then distributing the

---

* Honorable Daniel B. Sparr, United States District Judge, for the District of Colorado, sitting by designation.

cocaine to persons in the Kansas–Oklahoma area. One individual in Oklahoma to whom Munos was selling cocaine was Bob Ford, Jr., who resided in Tulsa, Oklahoma. Bob Ford, Jr. died in September, 1989, and his father Bob Ford, Sr. took over his son's cocaine business and he began purchasing cocaine from Munos and then distributing it to others.

On May 2, 1990, Bob Ford, Sr. and his wife, Connie, were in Oklahoma City, Oklahoma, for the purpose of purchasing six kilograms of cocaine for $120,000 from an individual they knew as "John". The Fords were arrested by police officers at the scene of the transaction. The Fords were then given an opportunity to "cooperate" with the drug authorities, and they agreed to do so.

In the ten-month period preceding May 23, 1990, Bob Ford, Sr. had sold. Laster, who also resided in Tulsa, Oklahoma, 8.9 kilograms of cocaine. This amount was established through records kept by Bob Ford, Sr.'s wife, Connie.

On May 3, 9, and 23, 1990, Bob Ford, Sr. telephoned Laster in Tulsa and advised him that he had some cocaine for sale and that a so-called "credit" sale could be arranged. As a result of these three telephone calls, Laster, on May 23, 1990, drove from Tulsa to Oklahoma City and met Ford at a local Oklahoma City hotel. On that occasion, Bob Ford, Sr. delivered eight ounces of cocaine to Laster on a "front" basis for $900 per ounce. Laster took the eight ounces of cocaine and was arrested as he left the hotel.

In sentencing Laster the district court initially took into consideration the eight ounces of cocaine which Laster received from Bob Ford, Sr., on May 23, 1990, that transaction being the basis for count four in the indictment to which count Laster had

pleaded guilty. Eight ounces of cocaine is the equivalent of .2267 kilograms of cocaine, or approximately 226.7 grams of cocaine. Under Sentencing Guideline § 2D1.1(c)(12), the base offense level for one who possesses at least 200 grams but less than 300 grams of cocaine, with an intent to distribute it, is 20.

However, the district court in determining Laster's base offense level also took into consideration the 8.9 kilograms of cocaine which the presentence report indicated Laster had received from Bob Ford, Sr. in the ten months preceding Laster's arrest on May 23, 1990. Adding the eight ounces of cocaine (.2267 kilograms) received by Laster from Bob Ford, Sr., on May 23, 1990, to the 8.9 kilograms received by Laster from Bob Ford, Sr., in the ten months preceding May 23, 1990, the district court determined that the proper amount of cocaine to be taken into consideration in determining Laster's base offense level was 9.1267 kilograms. Under Sentencing Guideline § 2D1.1(c)(6), the base offense level for a person who possesses at least 5 kilograms but less than 15 kilograms of cocaine, with an intent to distribute it, is 32. So, the district court set Laster's base offense level at 32, instead of 20, which is the nub of the present controversy.[1]

In line with a recommendation in the presentence report, the district court gave Laster a two-level reduction for his acceptance of responsibility, thereby reducing the base offense level from 32 to 30. The sentencing guideline range for one with a base offense level of 30 is 97 months to 121 months imprisonment. The district court then sentenced Laster to 97 months imprisonment.[2]

Although counsel for Laster did not concede that Laster received 8.9 kilograms from Bob Ford, Sr., in the ten months

---

1. In determining Laster's base offense level, the district court refused to take into consideration the amount of cocaine Laster may have received from Bob Ford, Jr., who died in September, 1989. However, even if the district court had included the cocaine Laster allegedly received from Bob Ford, Jr., Laster's base offense level would still be 32, since the total amount of cocaine would be under 15 kilograms.

2. As indicated, had the district court only considered the 8 ounces of cocaine involved in the May 23 transaction, Laster's base offense level would have been 20. Crediting him with a 2–level reduction, his final base offense level would have been 18. The sentencing guideline range for one with a base offense level of 18 is 27 to 33 months imprisonment.

preceding Laster's arrest on May 23, 1990, counsel did concede that the government's evidence in this regard would in fact show that Laster did receive 8.9 kilograms of cocaine from Bob Ford, Sr. in the ten months preceding May 23, 1990. Counsel's position is that the 8.9 kilograms of cocaine should not have been factored into Laster's final base offense level because it was not "relevant conduct" under the Sentencing Guidelines then in effect.

In arguing that the district court erred in factoring into Laster's base offense level the 8.9 kilograms of cocaine which Bob Ford, Sr. sold Laster in the ten months preceding Laster's arrest on May 23, 1990, counsel relies on Sentencing Guideline § 1B1.3(a)(1) which states that "relevant conduct" includes the following:

all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

Counsel asserts that any receipt by Laster of 8.9 kilograms of cocaine from Bob Ford, Sr. in the ten-month period preceding Laster's arrest on May 23, 1990, does not fit into § 1B1.3(a)(1), i.e. (1) such deliveries did not occur during the offense of conviction; (2) such deliveries did not occur in preparation for the offense of conviction; or (3) in the course of attempting to avoid detection for the offense of conviction; and (4) they were not otherwise in furtherance of the offense of conviction.

§ 1B1.3(a)(1) cannot be read in isolation and must be read in context. In that regard, § 1B1.3(a)(2) provides as follows:

solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction;

It is noted that § 1B1.3(a)(1) is general in nature and does not specifically refer to drug related offenses. In connection with § 1B1.3 under the heading *"Commentary—Background"* appears the following:

Subsection (a)(2) [set forth immediately above] provides for consideration of a broader range of conduct with respect to one class of offenses, primarily certain property, tax, fraud and drug offenses for which the guidelines depend substantially on quantity, than with respect to other offenses such as assault, robbery and burglary. The distinction is made on the basis of § 3D1.2(d), which provides for grouping together (*i.e.*, treating as a single count) all counts charging offenses of a type covered by this subsection. *However, the applicability of subsection (a)(2) does not depend upon whether multiple counts are alleged.* Thus, in an embezzlement case, for example, embezzled funds that may not be specified in any count of conviction are nonetheless included in determining the offense level if they were part of the same course of conduct or part of the same scheme or plan as the count of conviction. *Similarly, in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction* ... (emphasis added).

We further observe that Sentencing Guideline § 2D1.1, which sets forth the various offense levels for drug offenses based on the amount of the particular drug involved, under *"Commentary"*, note 12, states that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct)...."

Accordingly, we believe the test to be applied in the instant case is whether the 8.9 kilograms of cocaine which Laster received during the ten months prior to his arrest on May 23, 1990, "were part of the same course of conduct or part of a common scheme or plan as the count of conviction." We agree with the district court

that the several deliveries of cocaine aggregating 8.9 kilograms to Laster from Bob Ford, Sr. in the ten months prior to May 23, 1990, were a "part of the same course of conduct or part of a common scheme or plan as the count of conviction," the count of conviction being, of course, the eight-ounce delivery on May 23, 1990.

The presentence report indicates that Laster made numerous purchases of cocaine from Bob Ford, Jr. from 1981 until Bob Ford, Jr.'s death in September 1989, and that shortly prior to Bob Ford, Jr.'s death, Laster began buying cocaine from Bob Ford, Sr. and continued to do so until his arrest on May 23, 1990. As indicated, the total amount involved for this ten-month period was established through records maintained by Bob Ford, Sr.'s wife, Connie. Certainly there was a rather long-term relationship between Laster and the Ford family, and, in particular, an approximately ten-month relationship between Laster and Bob Ford, Sr., wherein Laster purchased cocaine from the Fords on a regular and prolonged basis. In our view, the cocaine deliveries in the ten months preceding May 23, 1990, were a part of a "common scheme" culminating in the arrest of Laster on May 23, 1990, in a "reverse sting" operation wherein Laster received eight ounces of cocaine from Bob Ford, Sr.

In support of our analysis of this matter, see such cases as *United States v. Ruth,* 946 F.2d 110 (10th Cir.1991), *petition for cert. filed* (U.S. Nov. 8, 1991) (No. 91–6381); *United States v. Gallegos,* 922 F.2d 630, 632 (10th Cir.1991); *United States v. Ross,* 920 F.2d 1530, 1538 (10th Cir.1990); *United States v. Harris,* 903 F.2d 770, 778 (10th Cir.1990); and *United States v. Boyd,* 901 F.2d 842, 844 (10th Cir.1990).

In each of the above cases the defendant was convicted of possession on a date certain of a Schedule II drug with an intent to distribute the same, and in each case in determining the defendant's base offense level the district court factored in other quantities of drugs that were a part of the same course of conduct or common scheme or plan as the offense for which the defendant was convicted. On appeal, we affirmed each.

Further, by way of example, in *Ross* at p. 1538, we stated that in determining under the Sentencing Guidelines the base offense level for a drug offense, the sentencing judge is "directed" to aggregate the quantities of drugs that were a part of the same course of conduct or common scheme as the offense of conviction, and that the defendant need not have been convicted or even indicted for the additional quantities thus included. Further, in *Ross* we said that the prosecution must prove, and connect to the offense of conviction, the additional quantities by a preponderance of the evidence, and that in this regard the district court's factual findings are reviewed under a clearly erroneous standard. The instant case meets that test.

Judgment affirmed.